UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 1:11cr50-06 (RWR) |
| | ) | |
| JAVIER EDUARDO JUAN BALLESTAS, | ) | |
| a/k/a "El Mono," | ) | Sentencing Date: |
| | ) | November 12, 2013, 10:00 a.m. |
| Defendant. | ) | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through the undersigned, respectfully submits this Memorandum in Aid of Sentencing in anticipation of the November 12, 2013 sentencing hearing in the above-captioned matter. The Government submits that 70 months represents a reasonable sentencing Guidelines range that appropriately accounts for each of the factors set forth in 18 U.S.C. § 3553(a). Accordingly, the Government respectfully requests that this Court impose a sentence of 70 months on the Defendant and at least three (3) years of supervised release, for the reasons stated herein.

### I.   FACTUAL BACKGROUND

The Defendant's prosecution arose out of a long-term international cocaine trafficking investigation conducted by the U.S. Drug Enforcement Administration and foreign law enforcement agencies in Colombia, Panama and Nicaragua. The investigation revealed that the Defendants Hipolito Martinez-Gonzalez, Eligio Martinez-Gonzalez, Felipe Martinez-Gonzalez, Eliseo Alvarez-Pino, Jimmy Abrahams-Navarro, Javier Eduardo Juan Ballestas, and Arnulfo Herrera-Sanchez, were members of a drug transportation organization ("DTO") contracted by large-scale cocaine traffickers/owners, to include Defendant Arnulfo Herrera-Sanchez, to

transport multi-ton shipments of cocaine from Colombia to points off the coast of Panama, Nicaragua, and elsewhere.[1]

Judicially-authorized intercepted telephone conversations established that Hipolito Martinez-Gonzalez operated as the leader of this organization, and that Felipe Martinez-Gonzalez, Alvarez-Pino, Abrahams-Navarro, and the Defendant provided logistical assistance in Colombia.  For instance, Felipe Martinez-Gonzalez assisted Hipolito Martinez-Gonzalez with the launching of go-fast boats from the northern coast of Colombia, specifically by adhering multiple high-powered motors to the vessels to ensure their swift travel and ensuring the vessel was "sea-ready."  Alvarez-Pino operated as Hipolito Martinez-Gonzalez's right-hand man, assisting with the loading of the go-fasts and captaining the vessels.  Abrahams-Navarro also assisted in loading the cocaine onto the go-fast vessels and helped navigate the vessels during the cocaine's transportation to Panama and/or Honduras.  The Defendant, Juan Ballestas, assisted the organization by periodically obtaining maritime "assets" reports or navigational charts or maps which purportedly indicated where U.S., Colombian, and other countries' Coast Guard and Navy air and maritime assets were operating in the Caribbean Sea on a particular day.  The DTO used these maps to coordinate the stateless go-fast vessels' travel from the northern coast of Colombia through international waters to Panama, Honduras, and elsewhere, through the best route that would avoid detection by maritime and law enforcement authorities.  Hipolito Martinez-Gonzalez would also obtain reports from the Defendant after the organization's loads were interdicted, so as to confirm the seizure.  Eligio Martinez-Gonzalez served as the transportation

---

[1] Hipolito Martinez-Gonzalez, Eligio Martinez-Gonzalez, and Felipe Martinez-Gonzalez are brothers.  Eligio Martinez-Gonzalez remains a fugitive.  On January 25, 2013, this Court granted the Government's motion to dismiss the Indictment against Eliseo Alvarez-Pino due to his serious medical condition.  Arnulfo Herrera-Sanchez is now deceased.

organization's logistics point-of-contact at the transshipment point in Panama, providing safekeeping for the cocaine shipments and lodging for transportation personnel who were to conduct the second leg of the transport.  The cocaine was then shipped from Panama to the owners, such as Herrera-Sanchez.  The transportation organization was required to pay a "tax" of several hundreds of dollars to another organization for each kilogram the DTO transported from the Gulf of Urabá on the northern coast of Colombia.  Based upon the investigation, wiretap interceptions, and surveillance, Colombian, United States and Nicaraguan law enforcement authorities effected several cocaine seizures from the DTO members in the case.

On or about May 30, 2008, the Nicaraguan Navy seized approximately 78 kilograms of cocaine from one of the DTO's go-fast vessels which the crew beached off the coast of Nicaragua on Corn Island after the Nicaraguan Navy pursued the vessel and the crew attempted to throw the cocaine packages overboard.  The crew, which included Alvarez-Pino, escaped. Before the Nicaraguan Navy arrived at the island, a group of people in a white van pulled up and removed some cocaine from the beached go-fast vessel.  The go-fast vessel that the DTO used was a white with blue trim go-fast vessel with three 200 hp outboard engines.  The vessel had no flag and no identifying markings.  Because the crew fled, no vessel nationality was claimed by the crew.

On or about February 2, 2009, Colombian authorities seized approximately 1,155 kilograms of cocaine from a cargo truck en route from Medellín, Colombia, to Turbo, Colombia. Several lawfully intercepted telephone conversations demonstrated that the load was associated with the DTO.

On or about May 29, 2009, Colombian Coast Guard / Navy authorities seized approximately 3,454 kilograms of cocaine from one of two go-fast vessels harbored close to

3

shore near Totumo, Colombia, in the Gulf of Urabá.  Colombian law enforcement authorities

also searched two vehicles found nearby on the beach and found Hipolito Martinez-Gonzalez's

driver's license and an insurance card and bill of sale for one of the vehicles in the name of

Abrahams-Navarro.[2]  Hipolito Martinez-Gonzalez, Abrahams-Navarro, and Alvarez-Pino had

been assisting in loading the cocaine into the go-fast vessel but escaped on foot prior to the

Colombian authorities' arrival.  Abrahams-Navarro was also to be one of the crew members on

board the vessel when the cocaine was transported from the Gulf of Urabá to Panama.  The go-

fast vessel which contained the cocaine had several outboard motors and was stateless, bearing

no flag, markings, or registration numbers.  Because the crew fled, no vessel nationality was

claimed by the crew.

On or about July 22, 2009, the Colombian Navy and Coast Guard intercepted two go-fast

vessels in international waters and seized approximately 420 kilograms of cocaine.  Judicially-

authorized intercepted telephone conversations also linked this load to the organization.

On or about March 3, 2010, the U.S. Coast Guard / Navy seized approximately 1,503

kilograms of cocaine from another of the DTO's go-fast vessels which had been located

approximately 12 nautical miles north of Punta Grande, Panama, and had traveled through the

high seas on its way to Honduras.  The go-fast vessel was a 40-foot long Eduardoño-style vessel

with no visible flag or registration numbers, operating at night without navigation lights.  The

---

[2] An AK-47 rifle was also seized during the search. However, the Government has no
information to specifically link this rifle to the Defendants in this case, such that it belonged to or
was possessed by one of the Defendants or was otherwise brought to the loading site by one of
the Defendants.  The evidence supports that there were other individuals from another
organization at the launch point and our preliminary information suggests the rifle belonged to
them.  For these reasons, and without further information, the Government has not sought and
does not believe any gun enhancement in the case is adequately supported at this time.

vessel's five crew members, who were Honduran citizens, were arrested.  The master of the

seized go-fast vessel was interviewed and admitted that the go-fast vessel was taking a load of

cocaine to Honduras.  The master of the go-fast vessel claimed Honduran registry for the vessel,

but after the U.S. Coast Guard officials contacted the Honduran officials, the Government of

Honduras failed to affirmatively and unequivocally assert that the vessel was of Honduran

nationality.  Hipolito Martinez-Gonzalez coordinated the first leg of the cocaine transport from

Colombia to Panama.  The organizational members on board the vessel during the first leg of the

transport were Alvarez-Pino, Abrahams-Navarro and another individual.  The five Honduran

crew members that were arrested during the second leg of the transport, and who belonged to

another transportation organization, were prosecuted in the Middle District of Florida in

Criminal Case Number 8:10cr100, for their involvement in the drug transport.  Four of those

defendants were convicted following trial. The fifth, the captain, pleaded guilty and testified

against his co-defendants, stating that he and his crew were contracted to go to Panama where

they would be met by an individual known as "El Brujo," a/k/a "El Majo," "Aleshio" (phonetic

spellings in the trial transcript, likely meaning "El Mago" and "Eligio"), who would thereafter be

responsible for dispatching them on the return trip with a cocaine-laden vessel.  The captain also

testified that in discussing the risks of the transport with "El Brujo"/"El Majo," the crew was

assured that there would be no problem because the crew would be given Coast Guard reports,

referring to the maritime "asset reports."  Co-Defendant Eligio Martinez-Gonzalez is also known

as "El Mago."

On or about March 11, 2010, the U.S. Coast Guard / Navy seized approximately 2,000

kilograms of cocaine from the sea after responding to the coordinates of a suspected go-fast

venture in the vicinity of San Blas, Panama.  The U.S. maritime assets spotted the go-fast boat on

the high seas, approximately 17 nautical miles north of Punta Grande, Panama, and 40 nautical miles northeast of Colón, Panama.  With the permission of Panamanian law enforcement officials, U.S. authorities pursued the go-fast vessel into Panamanian waters.  The go-fast was described as a 40-foot long, Eduardoño-style vessel with no visible flag, name, or registration numbers, operating at night with no navigation lights.  During the chase, the crew members threw the suspected contraband overboard, beached the go-fast vessel on the shore of Colón, Panama, and escaped into the jungle.  No crew members asserted vessel nationality.  An additional approximately 175 kilograms were removed from the beached go-fast vessel by Panamanian authorities.  Hipolito Martinez-Gonzalez coordinated this shipment from Colombia to Panama and used Alvarez-Pino, Abrahams-Navarro and another individual to transport the drugs.

On September 10, 2010, information obtained from the judicially-authorized telephone interceptions led to the Colombian Coast Guard's interdiction of a go-fast vessel approximately ten nautical miles off the coast of Mulatos, Colombia.  Law enforcement officers observed the crew members throwing objects overboard.  When the vessel beached on the coast of Colombia, all members of the crew escaped; one of those members was Abrahams-Navarro.  The Colombian Coast Guard seized approximately 1,153 kilograms of cocaine.  Lawfully intercepted telephone conversations demonstrated that Hipolito Martinez-Gonzalez and Felipe Martinez-Gonzalez were also involved in the coordination and/or attempted recovery of the cocaine that was the subject of this seizure.

## II.   PROCEDURAL BACKGROUND

The Defendant and six others were indicted on February 23, 2010, on charges of conspiring to distribute and possess with intent to distribute five kilograms or more of cocaine on

board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503 and 70506(b). *See* DE 3 in Criminal Case No. 1:11cr50. On August 20, 2013, the Defendant pleaded guilty pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B) to a Superseding Information charging conspiracy to distribute and possess with intent to distribute a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a)(1) and 70506(b). *See* DE 87 ("Superseding Indictment") and DE 91 ("Plea Agreement"). The offense carries no mandatory minimum term of imprisonment, but a statutory maximum term of twenty years, a fine not to exceed $1,000,000, a period of supervised release of at least three (3) years, and a $100 special assessment.

The parties stipulated to the following Guidelines factors: Base Offense Level 38 (representing 150 kilograms or more of cocaine) which is to be decreased by four (4) levels pursuant to U.S.S.G. § 2D1.1(a)(5)(A) and (B)(iii), as a result of the Defendant's adjustment under U.S.S.G. § 3B1.2(b) (Mitigating Role); a two-level reduction pursuant to Sentencing Guidelines § 2D1.1(b)(16) because the Defendant meets the criteria set forth in subdivisions (1) through (5) of Sentencing Guidelines § 5C1.2(a); an additional mitigating role downward adjustment of two (2) levels under U.S.S.G. § 3B1.2(b), for being a minor participant in the criminal activity; and a 3-level reduction for acceptance of responsibility, resulting in a Total Offense Level 27 and Criminal History Category I or 70-87 months imprisonment. *See* DE 91 at ¶¶ 8-11. Further, the Government agreed to seek a sentence at the low end of the stipulated Guidelines range if the Defendant complies with all the terms and conditions of the Plea Agreement. *See* DE 91 at ¶ 11. The parties otherwise agreed that the Defendant may seek a downward departure or variance from the otherwise applicable guideline range established by the

Sentencing Guidelines and the Court.  However the Government will oppose any such arguments.  *See* DE 91 at ¶ 8(e).  Defendant's sentencing hearing is currently set for Tuesday, November 12, 2013, at 10:00 a.m.

### III.  **ARGUMENT**

Under the Sentencing Reform Act, as interpreted by the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the district courts follow a two-step process when imposing a sentencing on a defendant.  First, the Court must properly calculate and consider the defendant's Sentencing Guideline range.  *Booker*, 543 U.S. at 245; *United States v. Coumaris*, 399 F.3d 343, 351 (D.C. Cir. 2005); *United States v. Ventura*, 481 F.3d 821, 823 (D.C. Cir. 2007).  The Sentencing Guidelines "should be a starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49-50 (2007).  The Sentencing Guidelines are advisory, not mandatory.  *United States v. Motley*, 587 F.3d 1153, 1158 (D.C. Cir. 2009) ("In *Booker*, the Supreme Court excised the statutory section that had made the Guidelines mandatory, thus rendering them advisory."); *United States v. Dorcely,* 454 F.3d 366, 375 (D.C. Cir. 2006) ("In a post-*Booker* world, the [sentencing] court must calculate and consider the applicable Guidelines range but is not bound by it.").  Further, in *Motley*, the Court noted that "most (but not all) circuits have held that calculating the Guidelines sentence includes taking into account any traditional Guidelines-based departure."  *Motley*, 587 F.3d at 1158; *see also, e.g., United States v. Vasquez-Lebron*, 582 F.3d 443, 445 (3d Cir. 2009) (requiring sentencing court to calculate Guideline range, state on the record whether any departure was being granted and, if so, how such departure affects Guidelines calculation, and then exercise discretion by considering § 3553(a) factors when imposing final sentence).

In the second step, the Court must "tailor the sentencing in light of other statutory factors as well." *Booker*, 543 U.S. at 245; *Coumaris*, 399 F.3d at 351.  Those statutory factors include, as set forth in 18 U.S.C. § 3553(a):

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, protect the public from further crimes by the defendant, and provide the defendant with rehabilitation, education and training, and other correctional treatment; and

(3)     the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.

*Gall*, 552 U.S. at 49-50; *Booker*, 543 U.S. at 245.  The District Court "may not presume that the Guidelines range is reasonable." *Gall*, 552 U.S. at 50 (citing *Rita v. United States*, 551 U.S. 338, 351 (2007)).  Instead, the Court at sentencing must make an "individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50.

A.     <u>The Probation Office Correctly Calculated the Defendant's Sentencing Guidelines Range.</u>

The Probation Office determined that the Defendant's Total Offense Level is 27 with a Criminal History Category of I for a sentencing range of 70-87 months, as the parties stipulated. PSR at ¶¶ 44, 47, 48, 76.  The Probation Office held the Defendant accountable for 150 kilograms or more of cocaine (Base Offense Level 38).  PSR at ¶ 35.  The Probation Officer also determined that the Defendant's conduct supported a combined six-level reduction pursuant to U.S.S.G. § 2D1.1(a)(5)(A) and (B)(iii) and § 3B1.2(b), as a result of the Defendant's mitigating minor role in the criminal activity. PSR at ¶¶ 35, 38.  The Probation Officer also agreed with the parties on the two-level reduction pursuant to Sentencing Guidelines § 2D1.1(b)(16) because the

Defendant meets the criteria set forth in subdivisions (1) through (5) of Sentencing Guidelines § 5C1.2(a).  PSR at ¶ 36.  The Probation Office included a three-point downward adjustment for acceptance of responsibility which the Government moves for at this time.  PSR at ¶¶ 42-43. The Probation Office did not impose any other adjustments or departures in the PSR.  Finally, the Probation Officer determined that the Defendant's zero criminal history points placed him in Criminal History Category I.  PSR at ¶ ¶ 47, 48.  Thus, the Probation Office determined the Defendant's sentencing range is 70-87 months.  PSR at ¶ 76.

**B.      A Sentence of 70 Months Incarceration Complies With the Factors and Considerations Set Forth in 18 U.S.C. § 3553(a).**

The Government respectfully submits that a sentence of 70 months imprisonment is sufficient, but not greater than necessary, to accomplish the objectives set forth in 18 U.S.C. § 3553(a).

**1.      Nature and Circumstances of the Offense**

The Defendant committed a serious crime against the United States, having admitted to conspiring to distribute and possess with intent to distribute cocaine on board a vessel subject to the jurisdiction of the United States.  Between May 2008 and September 2010, the Defendant and his associates in the DTO provided maritime transportation services to various cocaine traffickers who needed to move multi-ton quantities of cocaine from the Gulf of Urabá, on the northern coast of Colombia, through the high seas to Panama, Honduras, and elsewhere.  In his capacity as the leader, Defendant Hipolito Martinez-Gonzalez obtained the launch and rendezvous dates, times, and points from the buyer, co-defendant Herrera Sanchez (now deceased), and others.  To ensure the successful launch and transports, Hipolito Martinez-Gonzalez relied on the maritime "asset" reports he purchased from the Defendant.  These reports

purportedly identified where U.S., Colombian, and other foreign law enforcement or military surveillance were patrolling the Caribbean Sea.  The DTO used these reports to plan the routes which would best avoid interdiction.  After receiving a "contract" for the cocaine transport, Hipolito Martinez-Gonzalez organized his crew for the launches (typically co-Defendants Alvarez-Pino and Abrahams Navarro and an unindicted conspirator), while Felipe Martinez-Gonzalez made any repairs on the vessels at the launch points on the northern coast of Colombia and installed the multiple motors on the stateless go-fast vessels utilized by the organization so as to increase their speed and enhance the crew's ability to avoid law enforcement detection or capture.  The cocaine laden vessels were then sailed to Panama (or the plan was to sail them but some were interdicted) where they would be met by a third brother and co-Defendant, Eligio Martinez-Gonzalez, who was the Panama point-of-contact for the DTO's transportation organization.  Eligio Martinez-Gonzalez would then coordinate with Herrera-Sanchez (or his associates) and a different crew for the transport of the cocaine from Panama.  Over the course of 2½ years, the DTO shipped several tons of cocaine, many of which were seized, and organizational members engaged in numerous recorded wiretap calls in furtherance of the conspiracy.  *See, e.g.,* Joint Statement of Stipulated Facts, at DE 90.  When seizures occurred, Hipolito Martinez-Gonzalez would receive reports from the Defendant to confirm the seizure of one of the DTO's vessels.

The Defendant was instrumental in facilitating the launch of the cocaine-laden vessels as Hipolito Martinez-Gonzalez and the go-fast vessel crewmembers relied on the asset reports to chart their path and to avoid law enforcement to ensure a successful transport.  The Defendant was to be paid $3,500 to $4,000 for every asset report he provided.  *See* DE 90 at 4.  The use of the reports, combined with the organization's scheme to engage in maritime smuggling using

stateless vessels, shows the DTO's calculated efforts to evade law enforcement detection and a deliberate intent to place others (such as the crew members) at significant risk for arrest and imprisonment in foreign countries (not to mention possible risk to one's physical safety on the seas) as a result of their smuggling drugs on behalf of the DTO.  This activity also reflects a complete disregard for U.S. law prohibiting drug trafficking (as well as the laws of the countries any cocaine-laden vessel would travel through while transporting the drugs).

The quantity of cocaine smuggled also reflects the seriousness of the offense.  As noted above and in the Defendant's Joint Statement of Stipulated Facts, maritime authorities were involved in the seizure of multiple cocaine-laden vessels sent by the DTO – the amount of cocaine seized was nearly ten tons.  Cocaine is a highly addictive narcotic drug that is abused at a significant cost to the users, their families, the medical community, law enforcement, and society in general.  Lives are ruined, families are torn apart, jobs are lost, and medical resources are stretched to the limit. Thus, the Defendant's efforts in facilitating the transport of multiple tons of cocaine by his associates, albeit ultimately unsuccessfully when seized, is undoubtedly serious.

The Government submits, based on the circumstances of the instant case and roles of the various Defendants, that a sentence of 70 months takes into consideration the nature and circumstances of the conspiracy and the type and quantity of drugs to be distributed, as well as the Defendant's minor but important role.  Such a sentence will reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct by the Defendant and others who would engage in such illegal conduct and protect the public from further crimes of the Defendant.

2.      **History and Characteristics of the Defendant**

The Defendant is a 36-year old Colombian citizen who was residing in Colombia at the time of his involvement in the conspiracy and his arrest on the Government's Provisional Arrest Warrant.  The PSR provides no extraordinary or remarkable information on the Defendant's childhood, family history, employment, or any other personal history factors which would warrant a sentence below 70 months.

The Defendant has admitted his role in the maritime transportation organization and his involvement in facilitating the referenced cocaine transports by providing the maritime asset reports.  The Defendant was also intercepted on numerous Colombian judicialized wiretap calls, to include with Hipolito Martinez-Gonzalez and an unindicted conspirator, reflecting his knowledge of and experience in participating in international drug trafficking via maritime routes.  The Government submits that a sentence of 70 months adequately accounts for the Defendant's history and characteristics and his role in the conspiracy.

3.      **Avoiding Disparity Among Similarly-Situated Defendants**

Section 3553(a)(6) articulates "the need to avoid *unwarranted* sentence disparities among defendants *with similar records* who have been found guilty of *similar conduct*."  18 U.S.C. § 3553(a)(6) (italics added).  By its terms, the statute requires a specific evaluation of the compared defendants' records and conduct.  When determining whether a sentence creates an unwarranted disparity, the Court should also consider, *inter alia*, a defendant's acceptance of responsibility, the nature and extent of a defendant's participation in the criminal activity, a defendant's criminal history, and whether and to what extent a defendant cooperated.  *See, e.g.*, *United States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (concluding that difference in sentences was "entirely explained" by co-defendant's acceptance of responsibility and thus any

13

disparity resulting from defendant's "harsher" sentence was not unwarranted).  A defendant is only entitled to "a weighing of the section 3553(a) factors that are relevant to [his] case, not to a particular result."  *United States v. Carrasco-De-Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).

Moreover, in *United States v. Joseph*, 399 F. App'x 599 (D.C. Cir. 2010), the D.C. Circuit determined that where the district court at sentencing conducted an appropriate comparison of the sentences of *co-conspirators* in a single case, that comparison satisfied § 3553(a)(6).  *See also Gall*, 552 U.S. at 54-55 (acknowledging as an acceptable practice the comparison of sentences of co-defendants within the same conspiracy) ("[I]t seems that the judge gave specific attention to the issue of disparity when he inquired about the sentences already imposed by a different judge on two of Gall's co-defendants."); *United States v. Fernandez*, 443 F.3d 19, 31 n. 9 (2d Cir. 2006) ("The plain language of § 3553(a)(6) seems not to prohibit judges from considering disparities between co-defendants").  In turn, the prevailing practice in the D.C. Circuit has been to compare co-defendants within the same case for unwarranted sentencing disparities rather than attempting to make comparisons to defendants in unrelated cases either within the District or outside the District.  *See, e.g., Mejia*, 597 F.3d at 1344; *United States v. Colwell*, 304 F. App'x 885, 885-86 (D.C. Cir. 2008) (upholding sentence against § 3553(a)(6) challenge on the basis of co-conspirators' criminal history category and number of fraudulent transactions in which co-conspirators participated, how much co-conspirators contributed to conspiracy's success, and crime to which each co-conspirator pled guilty); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007) (finding no unwarranted sentencing disparity because defendant and co-conspirators "did not hold comparable positions, either in the conspiracy or in their workplaces" and co-conspirators "provided substantial assistance in the investigation of the scheme, while [the defendant] did not").

In light of the above premises, the Government submits that an appropriate comparison can be made in the first instance between the Defendant and his co-Defendants.  Co-Defendant Jimmy Abrahams Navarro was sentenced on October 31, 2013, to 120 months (although the Government sought a sentence of 135 months, which was the lowest end of the determined Guidelines range of 135 to 168 months).  Abrahams Navarro served as one of the actual crew members assisting with navigation on three of the transports – the fourth planned transport, containing over three tons of cocaine in that one transport alone, was interdicted after loading but before the DTO could transport it to Panama.  As such, Abrahams Navarro was not a minor player in the organization and the difference in the stipulated factors and Guidelines range between Abrahams Navarro and the Defendant not only reflects as much but explains why the Government is seeking a lighter penalty in the Defendant's case.  Because of these different roles in the conspiracy, a sentence of 70 months for the Defendant is justified and does not create an unwarranted disparity with the sentence imposed in Abrahams Navarro's case.

Co-Defendant Felipe Martinez-Gonzalez's sentencing is now set for November 13, 2013, after having been postponed from October 31, 2013.  The Government is seeking a sentence of 70 months, consistent with the Plea Agreement in that Defendant's case.  Pursuant to the parties' stipulated factors, Felipe Martinez-Gonzalez was also held accountable for 150 kilograms or more of cocaine and the parties agreed to a two-level reduction under § 2D1.1(b)(16) and three levels off for acceptance of responsibility.  Similarly, as with the Defendant, the parties to Felipe Martinez-Gonzalez's agreement stipulated to a mitigating / minor role adjustment which reduced his Guidelines range.  Neither Felipe Martinez-Gonzalez nor the Defendant are receiving a § 5K1.1 reduction.  Felipe Martinez-Gonzalez played a different but also limited role in the organization in that he adhered the motors to some of the go-fast vessels, whereas the Defendant

provided the asset reports which were then used by the others to launch the boats.  Neither Defendant served as a leader of the organization or crew member during the transports.  Thus, a sentence of 70 months for the Defendant is consistent with the similarly-situated, although yet-to-be-sentenced, co-Defendant Felipe Martinez-Gonzalez.

Moreover, an appropriate comparison can be made between the Defendant and the related case conspirators.  As previously identified for the Court, the five-person crew of the March 3, 2010 seizure was captured by the U.S. Coast Guard and prosecuted in the Middle District of Florida in Criminal Case No. 8:10cr100.  Four of the crew members were convicted on the two indicted counts following a jury trial on the MDLEA substantive and conspiracy charges.  The fifth crew member, the captain, pleaded guilty to the conspiracy count of the Indictment.  This crew had obtained the cocaine with the assistance of the DTO's Panama point-of-contact, Eligio Martinez-Gonzalez, after the Colombian-based crew, to include co-Defendant Jimmy Abrahams Navarro, transported it from the northern coast of Colombia to Panama at Hipolito Martinez-Gonzalez's direction.  At sentencing, each of the Defendants was held accountable for 150 kilograms or more of cocaine (Base Offense Level 38), just as all the Defendants here are.  It appears from the sentencing minutes and the sentencing transcripts that all also received a 2-level reduction under § 2D1.1(b)(11), the predecessor to § 2D1.1(b)(16), after having debriefed with the Government, thereby bringing each down to Adjusted Offense Level 36 (188-235 months).  The Defendant has also received this two-level reduction.  None received a mitigating or aggravating role adjustment (whereas the Defendant here is considered a minor participant).  Two of the four Defendants which proceeded to trial nevertheless received 2-level reductions for acceptance of responsibility after taking additional steps to admit their involvement, bringing them down to Total Offense Level 34 / Criminal History Category I or 151-188 months.  These

two Defendants were each sentenced to concurrent 151-month terms on the two counts while the

two who did not receive the additional reduction for acceptance were sentenced to concurrent

188 months.  The instant Defendant will receive three levels for acceptance.  The captain was

sentenced to 97 months (Total Offense Level 30 / Category I or 97-121 months) after receiving a

three-level § 5K1.1 departure for substantial assistance after testifying at trial against his

conspirators.  While the instant Defendant proffered with the Government on one occasion, he

aggressively pursued a motions practice and his right to trial, until finally pleading after the

jurisdictional motions were resolved.  No § 5K1.1 motion is warranted for the Defendant.  The

Government's recommendation of 70 months for the Defendant would not be inconsistent with,

or result in an unwarranted sentencing disparity, as compared to these conspirators, given the

Defendant's minor role of providing the maritime asset reports so that other DTO members could

then transport the drugs to Panama, whereafter the secondary crew, in this case the five-person

Honduran crew, would transport them on the second leg.

Nor is the Government's recommended sentence of 70 months inconsistent with

sentences imposed in this district in other maritime conspiracy cases similar in scale.  In *United

States v. Wilson Jesus Torres Torres, et al.*, 1:08cr280 (DDC, J. Huvelle), Colombian defendant

Wilson Jesus Torres-Torres and his co-defendant, Baudilio Vivero-Cardenas, were members of a

Colombian drug transportation organization based in Buenaventura, Colombia that, over the

course of several years, transported thousands of kilograms of cocaine for various other drug

trafficking organizations from various ports along the coast of Colombia to waiting vessels that

then transported the cocaine to the United States and other countries.  Similar to here, U.S. and

foreign maritime authorities seized several cocaine-laden vessels associated with the

organization.  Both Torres-Torres and Vivero-Cardenas were also interdicted as crew members

on one of the smuggling vessels.  These defendants were also prosecuted on a conspiracy charge

under the Maritime Drug Law Enforcement Act (MDLEA), 46 U.S.C. §§ 70503, 70506.

Torres-Torres taught maritime skills at a vocational institute in Buenaventura, Colombia,

and used his position to refer students to maritime drug trafficking organizations in Colombia.

Pleading guilty without a cooperation agreement days before trial, Torres-Torres was sentenced

to 144 months under a Rule 11(c)(1)(C) plea agreement (Base Offense Level 38, minus three

levels for acceptance, for a Guidelines range of 168-210 months (Total Offense Level 35 /

Criminal History Category I)).  *See United States v. Wilson Jesus Torre- Torres,* 1:08cr280

(DDC, J. Huvelle.), DE 69, ¶¶ 7-8 (Plea Agreement) and DE 94 (Judgment and Conviction).  Co-

defendant Baudilio Vivero-Cardenas was a boat mechanic and frequent go-fast crew member.

He also pleaded guilty under a non-cooperation Rule 11(c)(1)(C) Plea Agreement, to 96 months,

although he received a mitigating role adjustment (Base Offense Level 38, minus three levels for

acceptance, minus two levels for minor role, and minus four levels for mitigating role

adjustment, for a Guidelines range of 87-108 months (Total Offense Level 29 / Criminal History

Category I)).  *See United States v. Baudilio Vivero-Cardenas*, 1:08cr280 (DDC, J. Huvelle), DE

74, ¶¶ 7-8 (Plea Agreement) and DE 96 (Judgment and Conviction).  Both of these defendants

were involved in significant maritime drug trafficking activities.  However, unlike Torres-Torres

and Vivero-Cardenas, the Defendant did not recruit DTO members or participate as one of the

crew members in the transports, thereby supporting a lower term of years.

To the extent the defense may rely on the 60-month sentences imposed against two

traffickers in another maritime trafficking case which was prosecuted before Judge Collyer

recently, that case is also distinguishable.  *See United States v. Valderrama Carvajal and Munoz

Miranda*, DDC 1:10cr106 (J. Collyer).  Those Defendants pleaded guilty a day before trial to

Rule 11(c)(1)(C) pleas which fixed the sentence at 60 months -- each were held accountable for one to two seizures that amounted to approximately four tons interdicted over an approximately two-day period.  In comparison, the DTO that the Defendant was a member of transported almost ten tons of cocaine over 2½ years.  The Defendant's minor role in *his* organization's sophisticated trafficking scheme has been taken into account and a 70-month sentence appropriately accounts for his role, the scope of the conspiracy, and the quantity involved.

Regardless of the comparisons made, § 3553(a)(6) is only one factor the Court should consider when sentencing the Defendant.  *Colwell*, 304 F. App'x at 886; *United States v. Fernandez*, 443 F.3d 19, 32 (2d Cir. 2006) ("[T]he requirement that a sentencing judge consider an 18 U.S.C. § 3553(a) factor is *not* synonymous with a requirement that the factor be given determinative or dispositive weight in the particular case, inasmuch as it is only one of several factors.").  Thus, this Court should consider *all* of the § 3553(a) factors to determine whether they support the Defendant's sentence.  *Gall*, 552 U.S. at 49-50; *see also Kimbrough v. United States*, 552 U.S. 85, 108 (2007) ("Section 3553(a)(6) directs district courts to consider the need to avoid unwarranted disparities – along with other § 3553(a) factors – when imposing sentences.").

Taking into consideration all of the above and the § 3553(a) goals, the Government submits that a sentence of 70 months imprisonment yields a sentence that is sufficient but not greater than necessary to achieve the purposes of § 3553(a).

//

//

//

//

## IV.   <u>CONCLUSION</u>

Therefore, for the above-stated reasons, the United States submits that a sentence of 70 months would be reasonable and would account for each of the factors set forth in 18 U.S.C. § 3553(a).  Therefore, the United States respectfully asks this Court to impose upon the Defendant a sentence of 70 months imprisonment and three years of supervised release.

Respectfully submitted this 1st day of November 2013.

ARTHUR G. WYATT, Chief
Narcotic and Dangerous Drug Section
Criminal Division
United States Department of Justice

By:   _____/s/_____
Meredith A. Mills, Trial Attorney
(DC Bar #457843)
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
145 N Street, NE
East Wing, Second Floor
Washington, DC 20530
Tel: (202) 305-8506 / Fax: (202) 514-0483
Meredith.Mills@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of November 2013, I filed the foregoing GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING with the Clerk of the Court.  A copy will be served on the following via CM/ECF:

<u>Counsel for Javier Eduardo Juan Ballestas</u>
Ron Earnest, Esq.
7000 Carroll Ave., Second Floor
Takoma Park, MD 20912
Tel: 240-401-5277 / ronearnest@gmail.com


                    _____/s/_____
                    Meredith A. Mills
                    Trial Attorney (DC Bar #457843)
                    Narcotic and Dangerous Drug Section
                    Criminal Division
                    United States Department of Justice
                    145 N Street, NE
                    East Wing, Second Floor
                    Washington, DC 20530
                    Tel: (202) 305-8506 / Fax: (202) 514-0483
                    Meredith.Mills@usdoj.gov